NOT DESIGNATED FOR PUBLICATION

No. 116,362

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of B.M.T.C.,
A Minor Child.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; DANIEL T. BROOKS, judge. Opinion filed April 7, 2017. Affirmed.

*Richard L. Dickson*, of Wichita, for appellant natural father.

*Lesley A. Isherwood*, assistant district attorney, and *Marc Bennett*, district attorney, for appellee.

Before GARDNER, P.J., PIERRON and ATCHESON, JJ.

*Per Curiam*: Father appeals from the termination of his parental rights as to his son, B.M.T.C. Although Mother's parental rights were also terminated, she has not appealed. Because we find clear and convincing evidence supporting the district court's factual findings and we find no abuse of the district court's discretion, we affirm.

*CINC and pretermination proceedings*

In October 2014, the State filed a child in need of care (CINC) petition and an application for an ex parte order of protective custody in the Sedgwick County District Court on behalf of 5-year-old B.M.T.C. and his 10-year-old half-brother S'D.R.A.C., which alleged that it was contrary to the boys' welfare to remain in the home of their natural mother, A.L.C. (Mother), and it was in their best interests to find a suitable out-of-home placement. Although paternity had not been established, Mother identified

D.H.C., III (Father) as B.M.T.C.'s putative father. The State contended Father was not currently a resource for placement because he had "failed to and [was] unable to provide for [B.M.T.C.]'s safety, care, and control." This was based on three unsuccessful attempts to contact Father at his residence in Jonesboro, Arkansas, by Janet Barnes, a Social Worker Specialist with the Department for Children and Families (DCF).

That same month, after immediately issuing an ex parte order of protective custody, the district court held a temporary custody hearing. At this hearing, the district court found Father in default because he appeared only through his appointed counsel. The district court ordered that the children remain in the temporary custody of the Secretary of DCF in an out-of-home placement and ordered paternity testing.

Paternity testing established "by the percentage of 99.99" that Father was B.M.T.C.'s biological parent. At the adjudication hearing, Father, who again appeared only through his appointed counsel, submitted a statement of no contest to the CINC petition pursuant to K.S.A. 2016 Supp. 38-2248 and waived his right to an evidentiary hearing. Upon inquiry, the district court found a factual basis for Father's no contest statement, which he had knowingly and voluntarily offered.

Consequently, the district court accepted the no contest statement and adjudicated B.M.T.C. a CINC under K.S.A. 2016 Supp. 38-2202(d)(1), (2), and (3). The district court also entered a disposition order, which reinforced its previous orders, and authorized the State to initiate the Interstate Compact on the Placement of Children (ICPC) process for Father to determine whether B.M.T.C. could be placed in his Arkansas home.

Father expressed a willingness to also take placement of S'D.R.A.C. if necessary; therefore, Jessica Duntz, a social worker with the Saint Francis Community Services Reintegration Program (SFCS), requested an ICPC Relative home study for the placement of B.M.T.C. and S'D.R.A.C. from the Division of Children and Family

2

Services in Sharp County, Arkansas, in August 2015. Accordingly, the following day, Arkansas mailed Father the Safe Home study packet, which included a household information sheet, criminal and central registry check forms, adult maltreatment forms, driving record check forms, questionnaires, and three personal reference forms for Father to complete.

In the meantime, the district court had held two permanency hearings to access the progress being made towards achieving the permanency plan goal of reintegration. At the hearings in July and October 2015, the district court determined that it was still in the best interests of the children to remain in the custody of DCF in an out-of-home placement, although reintegration remained a viable option.

*The termination of parental rights*

Almost 3 months later, the State moved for a termination of Father's parental rights. It alleged that despite the fact that the court, DCF, and SFCS were available to provide services to assist Father in "stabilizing his situation to place him in a position to provide appropriate care to [B.M.T.C.]," Father had exhibited a lack of effort towards adjusting his circumstances, conduct, or conditions to meet B.M.T.C.'s needs.

The State further claimed that due to Father's unfitness, termination of Father's parental rights was in B.M.T.C.'s best interests. According to the State, Father only had telephone contact with B.M.T.C. since the case was initiated and had not requested visitation or sent "cards, gifts, or provided for [B.M.T.C.]'s needs while in [the] State's custody." Moreover, while "[t]here had been telephone visits between [B.M.T.C.] and [Father], . . . [Father] did not answer his telephone for several visits due to working third shift." Finally, although Mary Adkinson, an SFCS social worker, spoke with Father on September 24, 2015, regarding the status of the ICPC and Father reported that he had returned all the necessary paperwork, Duntz had recently informed the Office of the

District Attorney that as of December 17, 2015, Father had not completed the paperwork required for the completion of an ICPC home walkthrough.

In May 2016, the district court held a termination hearing. Although the State presented Father with regular and certified mail service, and Father signed for that service on March 28, 2016, Father did not personally appear at the hearing. When the district court asked his appointed counsel for any reason why Father should not be held in default, Father's counsel stated his belief that the State had validly served Father. Accordingly, the district court found Father in default.

The State subsequently proffered the following: the allegations contained in its motion for finding of unfitness and termination of parental rights; an April 15, 2016, SFCS report prepared by Duntz, who was present in the courtroom; and the ICPC denial packet issued by the State of Arkansas on February 19, 2016, due to noncooperation on Father's part. In response, Father's counsel informed the district court that it was not necessary to require Duntz to be "sworn for cross-examination on her report or any of the Exhibits." When asked if he had any opposition to the Exhibits, Father's counsel stated: "Your Honor, I wouldn't agree to the truth of the matters asserted, but I would agree that would be the evidence if presented, Your Honor."

After admitting the Exhibits, the district court found clear and convincing evidence that B.M.T.C.'s reintegration into Father's home was no longer a viable option. The district court determined that Father was unfit to properly care for B.M.T.C. under K.S.A. 2016 Supp. 38-2269(b)(4) ("physical, mental or emotional abuse or neglect or sexual abuse of a child"); K.S.A. 2016 Supp. 38-2269(b)(7) ("failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family"); K.S.A. 2016 Supp. 38-2269(b)(8) ("lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child"); K.S.A. 2016 Supp. 38-2269(c)(2) ("failure to maintain regular visitation, contact or communication with the

4

child or with the custodian of the child"); and K.S.A. 2016 Supp. 38-2269(c)(3) ("failure to carry out a reasonable plan approved by the court directed toward the integration of the child into a parental home"). The district court also concluded that the conditions of Father's unfitness were unlikely to change in the foreseeable future measured in "child time," and that termination of Father's parental rights was in B.M.T.C.'s best interests. Father timely appeals.

*Our scope of review*

A parent has a constitutionally protected and fundamental liberty interest in the relationship with his or her child. *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re B.D.-Y.*, 286 Kan. 686, 697-98, 187 P.3d 594 (2008). Thus the State may terminate one's parental rights only when "the court finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." K.S.A. 2016 Supp. 38-2269(a). "Clear and convincing evidence is evidence which shows that the truth of the facts asserted is highly probable." *In re B.D.-Y.*, 286 Kan. 686, Syl. ¶ 3. To ensure that children do not languish in State custody, courts consider "the foreseeable future" from the child's perspective, rather than that of the parent, because a child's perception of time differs from that of an adult. See *In re R.S.*, 50 Kan. App. 2d 1105, 1117, 336 P.3d 903 (2014); *In re L.S.M.A.*, No. 114,038, 2016 WL 1391809, at *9 (Kan. App. 2016) (unpublished opinion), *rev. denied* 304 Kan. 1017 (2016).

The Revised Kansas Code for Care of Children, K.S.A. 2016 Supp. 38-2201 *et seq.*, lists a number of nonexclusive factors the district court must consider in determining a parent's unfitness. See K.S.A. 2016 Supp. 38-2269(b). The court shall also consider a separate list of nonexclusive factors when, as in this case, the child is not in the physical custody of the parent. See K.S.A. 2016 Supp. 38-2269(c). Any one of the

factors in K.S.A. 2016 Supp. 38-2269(b) or (c) may, but does not necessarily, establish grounds for terminating a parent's rights. See K.S.A. 2016 Supp. 38-2269(f). When reviewing a district court's decision to terminate a parent's rights, an appellate court must "consider whether, after review of all the evidence, viewed in the light most favorable to the State, [it is] convinced that a rational factfinder could have found it highly probable, *i.e.*, by clear and convincing evidence, that the parent's rights should be terminated. [Citation omitted.]" *In re K.W.*, 45 Kan. App. 2d 353, 354, 246 P.3d 1021 (2011).

Upon making a finding of unfitness of the parent, "the court shall consider whether termination of parental rights as requested in the petition or motion is in the best interests of the child." K.S.A. 2016 Supp. 38-2269(g)(1). In making such a determination, the court shall give primary consideration to the physical, mental, and emotional needs of the child. K.S.A. 2016 Supp. 38-2269(g)(1). The district court is in the best position to determine the best interests of the children, and an appellate court cannot overturn such a determination without finding an abuse of discretion. *In re K.P.*, 44 Kan. App. 2d 316, 322, 235 P.3d 1255 (2010). A judicial action constitutes an abuse of discretion if it is (1) arbitrary, fanciful, or unreasonable, *i.e.*, no reasonable person would have taken the view adopted by the court, (2) guided by an erroneous legal conclusion, or (3) based upon an error of fact. See *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 2.

*Does clear and convincing evidence support the district court's decision to terminate the father's parental rights?*

Father contends that clear and convincing evidence does not support the district court's decision to terminate his parental rights because "he has 'substantially complied' with the [c]ourt's orders." Father asserts that the failure to achieve reintegration in this case was caused by the fact that Kansas and Arkansas did not make reasonable efforts to assist and support him in achieving this goal.

6

As explained above, the district court's findings of unfitness were based on the State's motion for finding of unfitness and termination of parental rights, Duntz' SFCS report, and Arkansas' ICPC denial packet. Having reviewed the information contained in those documents, we find clear and convincing evidence supporting the district court's conclusions.

First, the evidence shows that Father did not make a reasonable effort to achieve reintegration because, for some unknown reason, he neglected to complete the simple task of providing Arkansas with the paperwork necessary to complete the ICPC process. Arkansas' ICPC denial packet indicates that the Division of Children and Family Services in Sharp County, Arkansas denied Kansas' ICPC Safe Relative home study and placement request for B.M.T.C. and S'D.R.A.C. due to noncooperation on Father's part. Arkansas explained:

"Safe Home study packet was mailed to [Father] . . . at [his address in] Jonesboro, [Arkansas] . . . on 8/26/2015. Enclosed was household information sheet, criminal and central registry check forms, adult maltreatment forms, driving record check forms, questionnaires and three personal reference forms. Several calls were made to [Father] on 8/31, 11/5/15, 11/18/15 about [Father's] Drivers ID and the form."

Moreover, on September 24, 2015, Father informed Adkinson that he had sent off all of the necessary ICPC paperwork. While this statement may or may not have been truthful at the time, Duntz reported that the "Reintegration Social Worker called the ICPC worker" on November 30, 2015, regarding the status of the ICPC, and the ICPC worker indicated that "a home study ha[d] not been ordered yet, because [Father] ha[d] not completed all the forms." Apparently, Father did not have a valid driver's license, and although the ICPC worker mailed Father a form he needed to complete for an investigation into his past driver's license over 6 weeks prior to November 30, Father failed to return it. Duntz explained, "[Father] does not have a valid [driver's license]; [the ICPC worker] still has to run his past [driver's license]; there is a form that he needs to

7

complete. [The ICPC worker] stated to this worker that she mailed that form with a return envelope over 6 weeks ago."

Duntz further indicated that she had not had "consistent contact with [Father]," a failing which Father attributed to "a phone number change for him." Duntz maintained that Father, despite having knowledge of the reason for the ICPC denial, made no attempt to obtain a reversal of that decision. Duntz explained that she had received a voicemail from Father on April 12, 2016, after the ICPC was denied, "inquiring [as to] what he needed to do to get placement of [B.M.T.C.]." Although she left Father a return voicemail which informed him that "the ICPC was denied due to lack of contact and [he] needed to contact the ICPC in Arkansas to see what need[ed] to happen to restart the process," Father neglected to take such an action. Father's inaction was not due to an inaccurate phone number or lack of communication.

Second, Father failed to maintain regular visitation, contact, or communication with B.M.T.C. and made no effort to adjust his circumstances, conduct, or conditions to meet B.M.T.C.'s needs during the pendency of the proceedings. Duntz reported that Father made a lackluster attempt to regularly talk to B.M.T.C.:

> "There have been phone visitations between [B.M.T.C.] and his father in the past. [B.M.T.C.] enjoys talking to his father and looks forward to doing so. [Father] did not answer his phone for several visits, due to working third shift. [Father] expressed wanting [to] hav[e] a relationship with [B.M.T.C.].  [Father] recently changed his phone number. Reintegration social worker provided foster parent and [Father] with a conference phone number to reestablish the phone contact. Foster parent stated that he would report each phone call to this worker. The phone calls were to start on Sunday December 20th, 2015; foster father stated that he has been unable to get in touch with [F]ather. This worker sent [F]ather and foster father each other's email so they could coordinate skype and phone visits. To date this has not occurred."

8

Finally, Father, who maintained stable employment in Arkansas, neglected B.M.T.C. by choosing not to financially support him. Specifically, Duntz reported that although Father sent B.M.T.C. "cards and gifts for his birthday," Father "has not provided any financial support to [B.M.T.C.] while he has been in [State] custody." Father challenges this by stating that he also sent a pillow and toys to B.M.T.C. Father did not, however, provide an appropriate citation to the record, as the volume and page number he cited does not support this factual assertion. But even had Father sent B.M.T.C. a pillow and some toys, those items do not constitute financial support.

Father attempts to negate the evidence of unfitness outlined above by claiming that his failure to achieve reintegration with B.M.T.C. was because SFCS and Arkansas did not treat him in a "fair and reasonable" manner. More specifically, Father claims that Kansas and Arkansas did not make a good faith effort towards reintegration, because Arkansas did not "go out to his home or place of work to give him the Driver's License form so they could do the requested home study," and it was unreasonable to deem him uncooperative simply "[b]ecause one (1) Driver's License form was not completed."

As the State contends, however, while the Revised Kansas Code for Care of Children requires the appropriate agencies to expend reasonable efforts towards reintegrating the child with his or her parents, it does not require them to make "a herculean effort to lead the parent through the responsibilities of the reintegration plan. [Citation omitted.]" See *In re B.T.*, No. 112,137, 2015 WL 1125289, at *8 (Kan. App.) (unpublished opinion), *rev. denied* 301 Kan. 1046 (2015). Thus the agencies involved in furthering B.M.T.C.'s reintegration with Father were not required to meet Father in person, to deliver the form to him, to await Father's completion of it, and to return the form to its proper place. Instead, those agencies clearly expended reasonable efforts towards achieving the goal of reintegration by mailing the necessary paperwork to Father, with a return envelope, at his address of record, and by making several follow-up attempts to reach Father by phone regarding the status of the ICPC. If Father were serious

9

about obtaining placement of B.M.T.C., he should have been able to fill out the paperwork that was a prerequisite for his home study without further prompting from Arkansas or Kansas.

Father does not separately challenge the district court's findings that his unfitness was unlikely to change in the foreseeable future or that termination was in the best interests of B.M.T.C. Nonetheless, we have reviewed these findings and uphold them. Father's lackluster attempt to obtain reintegration with B.M.T.C. demonstrates that he was either unwilling or unable to change his conduct or the conditions of his unfitness in the foreseeable future. The foreseeable future in CINC proceedings is viewed from a child's perspective because a child's perception of time differs from that of an adult. K.S.A. 2016 Supp. 38-2201(b)(4); *In re M.H.*, 50 Kan. App. 2d 1162, 1170, 337 P.3d 711 (2014); *In re S.D.*, 41 Kan. App. 2d 780, 790, 204 P.3d 1182 (2009). In addition, the court may predict a parent's future unfitness based on his or her past history. *In re Price*, 7 Kan. App. 2d 477, 483, 644 P.2d 467 (1982). Courts do not have to gamble with a child's future nor experiment with child's welfare before taking action. A child should not have to endure the inevitable to his or her detriment in order to give the parent an opportunity to prove his or her fitness as a parent. 7 Kan. App. 2d at 480 (quoting *In re East*, 32 Ohio Misc. 65, 69, 288 N.E.2d 343 [1972]).

At the time of the termination hearing, B.M.T.C. had been in State custody for approximately a year and half, which is a significant amount of time when viewed through the eyes of a child. During that time, he had been placed in several foster homes and was eventually separated from S'D.R.A.C. Moreover, in her report, Duntz noted: "[B.M.T.C.] need[s] stability and permanency. . . . [B.M.T.C.] ha[s] mental health needs and ha[s] anxiety centered on visitation and the unknown. When SFCS did not have visits for three (3) weeks due to weather and illness, [B.M.T.C.'s] behaviors decreased." Consequently, a reasonable person could certainly conclude, as the district judge did, that it was in B.M.T.C.'s best interests to terminate Father's parental rights because additional

time would only serve to further delay B.M.T.C.'s ability to obtain permanency. The district court is in the best position to determine the best interests of the children, and an appellate court cannot overturn that finding without finding an abuse of discretion. *In re K.P.*, 44 Kan. App. 2d at 322. The party asserting an abuse of discretion bears the burden to prove the abuse of discretion. *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106 (2013). Father has not met that burden.

This is certainly not the most egregious case of unfitness we have seen. But viewing all of the evidence in a light most favorable to the State, we find clear and convincing evidence that Father was unfit to care for B.M.T.C., and that his unfitness would continue into the foreseeable future. We find no abuse of discretion in the district court's finding that termination of Father's parental rights was in B.M.T.C.'s best interests.

Affirmed.